David J. Feldman, Esq.
Nevada Bar No. 5947
Rachel J. Holzer, Esq.
Nevada Bar No. 11604
THE FELDMAN FIRM
8831 West Sahara Avenue
Las Vegas, Nevada 89117
Telephone:  (702) 949-5096
Facsimile:  (702) 949-5097
dfeldman@feldmanattorneys.com
rholzer@feldmanattorneys.com
*Attorneys for Acuity A Mutual Insurance Company*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ESTEVAN ALVARADO-HERRERA, an individual,<br><br>                             Plaintiff,<br><br>v.<br><br>ACUITY A MUTUAL INSURANCE COMPANY, a Wisconsin corporation; and DOES I through XX, inclusive,<br><br>                             Defendants. | Case No. 2:22-cv-00438-CDS-NJK<br><br>**OPPOSITION TO MOTION FOR ORDER COMPELLING PRODUCTION OF CRITICAL CLAIM EVALUATION DOCUMENTS WITHHELD BY ACUITY** |

Defendant Acuity A Mutual Insurance Company, by and through its attorneys of record, David J. Feldman, Esq. and Rachel J. Holzer, Esq. of the Feldman Firm, respectfully submits this Opposition To Motion For Order Compelling Production Of Critical Claim Evaluation Documents Withheld By Acuity.

This Opposition is made and based upon the papers and pleadings on file herein, the following Memorandum of Points and Authorities, the attached exhibits, and any oral argument this Court may entertain at the time of hearing this matter.

. . .

. . .

. . .

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This breach of contract and insurance bad faith case stems from a January 30, 2017 vehicular accident that Plaintiff Estevan Alvarado-Herrera ("Mr. Alvarado") claims caused him to injure his back and left knee. Following the January 30, 2017 accident, Mr. Alvarado made claims to his employer's workers compensation carrier, the tortfeasor's insurance carrier, and he notified Acuity that he may assert a claim for underinsured motorist ("UIM") benefits under his employer's commercial auto policy.

Mr. Alvarado claims that as a result of the January 30, 2017 accident he has incurred medical special damages of nearly $2,500,000.00 in current and future medical special damages, as well as $120,000.00 in current lost wages, and additional future lost wages in an amount yet to be determined (although Mr. Alvarado claims he can never work again). These injuries were the subject of the underlying personal injury action Mr. Alvarado commenced against the tortfeasors.

To avoid being prejudiced by any judgment entered in the underlying personal injury action, Acuity intervened. Even though no claims were asserted against Acuity in the underlying personal injury action, Acuity's intervention was a necessary step to defend Acuity's interests under Nevada law, which provides that a lack of intervention could result in Acuity being bound by a default judgment against one of the named defendants. *See Est. of Lomastro ex rel. Lomastro v. Am. Fam. Ins. Grp.*, 124 Nev. 1060, 1067, 195 P.3d 339, 344 (2008) ("In Nevada, an insurance company 'is bound by the result of an action between its insured and an uninsured motorist when the carrier has notice of the action but elects not to intervene.'") (*quoting State Farm Mut. Auto. Ins. v. Wharton*, 88 Nev. 183, 187 n. 7, 495 P.2d 359, 362 n. 7 (1972)).

The underlying personal injury action resolved when Mr. Alvarado settled with the tortfeasors. Thereafter the case was dismissed. Mr. Alvarado takes the position that he was somehow prejudiced and Acuity somehow gained a tactical advantage as a result of the dismissal of the underlying case, yet Mr. Alvarado completely glosses over the facts that (1) following his settlement with the tortfeasors no causes of action remained pending in the underlying case, and (2) Mr. Alvarado never sought leave to amend his complaint to assert any causes of action against Acuity or any other party. Simply put, the underlying case was dismissed because all causes of action asserted therein were settled – not because of any action taken or position asserted by Acuity.

Mr. Alvarado was well compensated by his settlement with the tortfeasors pursuant to which he received more than $2,000,000.00, despite significant evidence presented in the personal injury action that Mr. Alvarado's claimed medical special damages and lost wages are grossly overstated. For example, in connection with the underlying litigation against the tortfeasor, Mr. Alvarado was evaluated by Dr. Jeffrey C. Wang, MD, who found that only a small portion of Mr. Alvarado's claimed medical special damages can be attributed the January 30, 2017 vehicular accident. Specifically, Dr. Wang opined,

> After September 2017, I do not associate any further ongoing subjectively reported spinal symptoms, nor any further medical or surgical treatment for the spine, to be related to the MVA. I do not relate the need for any of the spinal injections, nor the spinal cord stimulator, to be causally linked to the MVA. The structure injected were not injured by the incident, and the stimulator was for the degenerative arthritis, which pre-existed the incident.

**Exhibit 1**, p. DEF02195. Additionally, Mr. Alvarado was treated by Dr. Curtis W. Poindexter, M.D. in connection with the worker's compensation claim stemming from the January 30, 2017 accident. Dr. Poindexter's records indicate that Mr. Alvarado's medical care was directed by his personal injury attorney rather than a medical professional and that this was problematic from a medical standpoint. **Exhibit 2**, p. DEF01476; *see also Id*. at p. DEF1477 ("Again, he has done everything outside of the work comp system for strangely unknown reasons other than building up a personal injury claim through his attorney."). Dr. Poindexter further opined, "Often times, as in this case, many evaluations and multiple treatments are undertaken that are not justified or appropriate for the injured body parts that the patient experienced." *Id*. Dr. Poindexter further opined, "It is completely unclear to me why he has undergone a left knee scope." *Id*. at DEF01477. Finally, Dr. Poindexter opined that like the left knee scope, the spinal injuries claimed by Mr. Alvarado, "would not be at all related to his injury and he has had no significant spinal problems any of the times that I have seen him." *Id*. When Dr. Poindexter released Mr. Alvarado from care, he stated, "It appears obvious that there are multiple injuries and problems that are attempting to be added onto his claim. Unfortunately, these problems do not correlate well at all with the events of the injury and the description of problems and his initial examination in the hospital. He is released to full duty work and is released from care." *Id*. at DEF 1478-79.

Despite having been fully compensated by the tortfeasors, on February 8, 2022, Mr. Alvarado filed suit against Acuity asserting claims for: 1) Breach of Contract (seeking UIM benefits under the Policy); (2) Unfair Insurance Practices (for violations of NRS 687B.145(2) and NRS 686A.310); and (3) Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing ("Bad Faith"). Acuity subsequently removed the case to this Court based on diversity jurisdiction.

In the instant motion, Mr. Alvarado asserts that Acuity waived its attorney-client privilege merely by intervening in the underlying action and filing an Answer denying substantive allegations of the Complaint in this case. The rule advocated for by Mr. Alvarado would put insurance companies in an impossible position by requiring insurance companies to choose between the risk of being bound by a judgment entered against tortfeasors in an action to which the insurance company is not a party, or intervening in that action and thereby waiving the attorney-client privilege that would otherwise protect its communications with counsel. This position is untenable.

Acuity respectfully asks this Court to reject the harsh rule proposed by Mr. Alvarado and instead adopt the well reasoned rule enunciated in *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851 (1994), which has since been espoused by several courts that have addressed the issue and found fault with the expansion of the "at-issue" waiver test set forth *Hearn v. Rhay*, which Mr. Alvarado asks this Court to adopt. *See e.g. Bertelsen v. Allstate Ins. Co.*, 796 N.W.2d 685, 702–03 (S.D. 2011); *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137 (D.C. Cir. 2015) (finding no waiver where the privilege holder "neither directly stated that the [privileged investigation] had revealed no wrongdoing nor sought any specific relief because of the results of the investigation, [the privilege holder] has not 'based a claim or defense upon the attorney's advice."); and *State ex rel. Shelter Mut. Ins. Co. v. Wagner*, 575 S.W.3d 476, 482 (Mo. App. W. Dist. 2018) (criticizing the expansion of at-issue waiver flowing from *Hearn* and declining to adopt such an expansive at-issue waiver rule stating, "The resulting application of such a rule would mean that an insurance company would always waive privilege if it ever consulted an attorney because the attorney's counsel would likely form at least part of the basis for the insurance company's behavior. An insurance company would never be entitled to attorney-client privilege in cases of bad faith settlement, even if the attorney's advice was but a part of the information the insurance company used in its decision making process.").

The well reasoned rule enunciated in *Rhone-Poulenc* holds that "at issue" waiver cannot occur as a result of the assertion of issues by the privilege holder's opponent, but instead may only occur when the privilege holder takes some affirmative action to interject privileged matters into the case thereby placing privileged communications "at issue," such as when the privilege holder relies on the defense of acting in accordance with advice of counsel. *See e.g. Rhone-Poulenc, supra.; see also Hikita v. Nichiro Gvogyo Kaisha, Ltd.*, 713 P.2d 1197, 1207 (Alaska 1986) (client's offer of attorney's testimony as to client's state of mind waives privilege); *Beckette v. State*, 31 Md. App. 85, 94 (1976) (calling attorney as character witness to client's truthfulness waives privilege). Because the *Rhone-Poulenc* rule is the only rule consistent with policies underlying the attorney-client privilege and the system-wide benefits derived therefrom, Acuity believes the Nevada Supreme Court would adopt the *Rhone-Poulenc* rule and asks this Court to do the same.

Under the *Rhone-Poulenc* rule no waiver has occurred, because Acuity has done nothing to interject privileged matters into this case. Further, even if the Court were to apply the *Hearn* rule as previously applied in this District, no waiver has occurred, because Acuity has taken no affirmative act to place privileged matters at issue other than answering the complaint filed by Mr. Alvarado, and even under *Hearn* this is not enough to imply waiver. If, however, the Court finds some waiver may have occurred, no disclosure ought to be ordered unless the Court first conducts an in camera review of withheld documents and determines that same are vital to Mr. Alvarado's ability to overcome a defense asserted by Acuity.

## II.  RELEVANT FACTUAL AND PROCEDURAL HISTORY

### A.    General Facts Regarding This Litigation and The Underlying Litigation

Mr. Alvarado first reported his UIM claim to Acuity on February 24, 2017. *See* ECF No. 23-4, Exhibit 4 to Plaintiff's Motion to Compel, portion of Acuity's Claim file, p. DEF00001. On that same day Bruce T. Kides, an adjuster employed by Acuity, was assigned primary responsibility for handling the claim. *Id*. Mr. Kides' investigation was overseen by supervisor Melissa Grandon. *Id*. at DEF00004.

Mr. Kides immediately began investigating the claim. *Id*. Mr. Kides established communication with Mr. Alvarado's employer, Mr. Alvarado's attorney, and the tortfeasor's insurer, and ordered the accident report from the Las Vegas Metropolitan Police Department. *Id*. at p. DEF00002. Over the next several weeks Mr. Kides diligently investigated the claim, maintained

communication with the insured as well as with the tortfeasors' insurers, obtained relevant damage estimates, and promptly reviewed medical records and bills. *Id*. at DEF00003-4.

On November 15, 2018, after reviewing Mr. Alvarado's demand and the accompanying medical records and bills, and long before Attorney Temple was retained, Mr. Kides routed a message to Ms. Grandon stating, "from what on file would seem that the $1mil underlying should be sufficient." *Id*. at DEF00005. Ms. Grandon and Mr. Kides discussed the claim that same day. *Id*. On November 19, 2018, Mr. Kides reviewed additional medical records and bills from Dr. William Muir M.D. *Id*.

On December 7, 2018, Mr. Kides spoke with Mr. Alvarado's attorney. *Id*. at DEF00006. Mr. Alvarado's attorney granted a thirty day extension to respond to the demand. Mr. Kides confirmed there were no other known coverages and requested additional information regarding Mr. Alvarado's claimed wage loss and workers compensation claim. *Id*.

On December 8, 2018, Mr. Kides received an email from Mr. Alvarado's attorney stating that Mr. Alvarado was scheduled for surgery, and accordingly the UIM demand would be updated in the near future and **the deadline to respond to the UIM demand would be extended indefinitely**. *Id*. at DEF00006-7.

On December 27, 2018, another Acuity employee, Tom Behrend routed a note in the claim file to Mr. Kides and Ms. Grandon stating, "Need DA retained to represent Acuity in this UIM claim." *Id*. at DEF00008. Ms. Grandon then instructed Mr. Kides to contact attorney Marissa Temple to determine whether she could accept the assignment as Acuity's defense attorney in the UIM claim. *Id*.

Attorney Temple was ultimately retained to act as Acuity's defense attorney in the UIM claim and on January 16, 2019, Mr. Kides entered a note in the claims file stating, "do have DC[1] assigned and she was going to reach out to atty to get on the list for updates and mailings." *Id*.

Mr. Kides, Ms. Grandon, and Mr. Behrend did not, however, terminate their own investigation or evaluation of the UIM claim following Acuity's retention of Attorney Temple. For example, on January 16, 2019, Mr. Kides spoke with Greg Harris, who was on scene right after the accident occurred, and in that conversation investigated both the facts of the accident and the potential that additional sources of coverage from the tortfeasors. *Id*. at DEF00009. Likewise, on

---

[1] Defense Counsel

6

February 12, 2019, Ms. Grandon reviewed the claim file and noted "Medical records regarding spinal stimulator have not been received." *Id*. at DEF00010. Similarly, on May 23, 2019, Mr. Kides routed another note to Ms. Grandon and Mr. Behrend stating, "we have been told that the at fault driver has a 1 million policy. Defense is confirming the carrier and if there I (*sic*) any excess coverage available. It may have also been a hired truck so the company which hired and supplied the driver could have some exposure so looking into that as well." *Id*. at DEF00011.

The ongoing investigation and evaluation of the UIM claim by Acuity's employee adjustor and his supervisors continued throughout the litigation of the underlying personal injury case and included ongoing efforts to ensure all coverage for the tortfeasors had been identified, all relevant workers compensation records, medical records, and medical bills had been received and reviewed, and even included Mr. Kides traveling to Las Vegas to attend the deposition of Mr. Alvarado for purposes of further understanding and evaluating the bases for the UIM claim. *See Id*. at DEF00010-19. The claims file is replete with entries by Mr. Kides demonstrating that he continued to conduct his own investigation and evaluation of the UIM claim throughout the underlying litigation. For example, on February 12, 2021, Mr. Kides entered a note stating, "WC dr released to full duty work on 4/19 very upset with care no records felt atty running case not any medical provider does not believe any spinal injury from this accident did not think the knee surgery was due to the accident or necessary." *Id*. at DEF00021. Finally, based on Mr. Kides investigation and evaluation of the UIM claim, on March 10, 2021, Ms. Grandon entered a note in the claim file stating, "Status review. I had talked with Bruce [Kides] on this case. We are continuing to monitor, but does not appear to be a UIM exposure." *Id*. at DEF00022. As is clear from the foregoing, there was never a time when Attorney Temple took over for Mr. Kides as the party responsible for investigating and evaluating the UIM claim. To the contrary, Mr. Kides commenced his investigation and evaluation of the claim on the very day it was reported to Acuity, and it was Mr. Kides, Ms. Grandon, and Mr. Behrend who worked together to ensure that prompt and appropriate steps were taken to conduct a full and fair investigation of the claim at every stage.

**B.    Facts Regarding the Discovery Dispute**

On April 5, 2022, Mr. Alvarado served his first set of requests for production of documents on Acuity in this case. *See* ECF No. 23-5, Exhibit 5 to Plaintiff's Motion to Compel, Plaintiff's

Request for Production of Documents to Defendant.  Among other things, Mr. Alvarado requested a complete copy of the claims file.

On May 5, 2022, Acuity served timely responses identifying by Bates number the previously produced responsive documents and setting forth objections on the basis that documents withheld from the previously produced claims file are protected by the attorney work product doctrine and attorney-client privilege. *See* ECF No. 23-6, Exhibit 6 to Plaintiff's Motion to Compel, Defendant's Responses Plaintiff's Request for Production of Documents.

The privilege log produced by Acuity identifies each withheld document by Bates number, sets forth the date on which each document was created, provides a title for each document, identifies both the author(s) and recipient(s) of each document, describes the contents of each withheld document, and identifies the privilege asserted. *See* ECF No. 23-7**,** Exhibit 7 to Plaintiff's Motion to Compel, privilege log produced by Acuity.

In the instant motion, Mr. Alvarado does not identify any particular request for production to which he claims he has not received a complete response, but instead merely generally refers to his entire first set of requests for production and Acuity's responses thereto. *See* ECF No. 23, Plaintiff's Motion to Compel. Likewise, Mr. Alvarado does not assert any specific challenge to any of the withheld documents, rather he seems to take the position that Acuity is entitled to no protection whatsoever under either the attorney work product doctrine or attorney-client privilege merely because it intervened in the underlying personal injury claim, withdrew from that claim after Mr. Alvarado settled all causes of action asserted therein, and then filed an answer to the complaint filed by Mr. Alvarado in this case. *Id*.

### III. LEGAL ARGUMENT

**A.   Those Portions of an Insurance Claims File That Constitute Attorney Work Product and Information Protected by the Attorney-Client Privilege Are Not Discoverable In The Absence of Waiver By the Privilege Holder.**

While it is true that trial courts are vested with broad discretion to permit or deny discovery, such discretion is limited to nonprivileged matter that is relevant to a party's claim or defense and is proportional to the needs of the case. *See Martinez v. James River Ins. Co.*, 219CV01646RFBNJK, 2020 WL 1975371, at *1 (D. Nev. Apr. 24, 2020); *see also Hallett v.*

*Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) ("[B]road discretion is vested in the trial court to permit or deny discovery.") and Fed. R. Civ. P. 26(b)(1).

Although "[t]he case law in this District has long made clear that an insurance claims file is generally relevant and discoverable," (*see Martinez.,* 2020 WL 1975371, at *4 (*citing Wood v. GEICO Cas. Co.*, 2016 WL 6069928, at *1 (D. Nev. Oct. 14, 2016)), this general rule does not abrogate the attorney-client privilege nor the attorney work product doctrine. *See id.* at *5 (acknowledging that "resolution of a discovery dispute regarding production of the claims file can be a significant step in the advancement of an insurance case," but "declin[ing] to resolve an issue as important as attorney-client privilege and attorney work-product protection, and any waiver thereof, when neither party has provided a coherent or meaningful discussion of the governing analysis."). Applicability of the attorney-client privilege must be made on a "document-by-document" basis. *Garcia v. Serv. Employees Intl. Union*, 217CV01340APGNJK, 2018 WL 6566563, at *2 (D. Nev. Sept. 6, 2018) (declining "to make an en masse ruling for 80 privilege designations"). Where there is a dispute as to whether a party who has withheld on the basis of an asserted privilege can make a prima facie showing of privilege, "[t]he party asserting privilege bears the burden of establishing the elements of that privilege." *Id.* at *2 (*citing U.S. v. Martin*, 278 F.3d 988, 999-1000 (2002)).

"The work product doctrine protects attorneys' thought processes and legal recommendations." *Lubritz v. AIG Claims, Inc.*, 217CV02310APGNJK, 2018 WL 10456239, at *3 (D. Nev. Apr. 18, 2018) (*citing Philips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 634 (D. Nev. 2013)). "To qualify for protection under this doctrine, the documents or information must: (1) be prepared in anticipation of litigation or for trial, and (2) be prepared by or for another party or by or for that other party's representative." *Id.* (*citing United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011)). "Unlike the attorney-client privilege, the application of the work product doctrine in diversity of citizenship cases is determined under federal law." *Kandel v. Bro. Intern. Corp.*, 683 F. Supp. 2d 1076, 1083 (C.D. Cal. 2010) (*citing Frontier Refining, Inc. v. Gorman–Rupp, Inc.*, 136 F.3d 695, 702 n. 10 (10th Cir.1998) and *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir.198)). "Rule 26(b)(3) of the Fed.R.Civ.P. [] distinguishes between ordinary work product and opinion work product with respect to the degree of need the requesting party has for the documents." *Moe v. System Transport, Inc.*, 270 F.R.D. 613, 626 (D. Mont. 2010) (*citing Dion v. Nationwide*

*Mutual Ins. Co.*, 185 F.R.D. 288, 292 (D.Mont.1998)). "Ordinary work product includes general documents and tangible things prepared in anticipation of litigation and is discoverable if the requesting party shows a 'substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" *Id*. at 626-27 (*citing* Fed.R.Civ.P. 26(b)(3)(A)(ii)). "In contrast, the Court is obligated to 'protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.' " *Id*. at 627 (*citing* Fed.R.Civ.P. 26(b)(3)(A)(ii)). Thus, opinion work product is afforded greater protection, and a party seeking such materials must show that the "mental impressions are directly at issue in a case and the need for the material is compelling." *Id*. (*quoting Dion*, 185 F.R.D. at 292).

The attorney-client privilege is a long-standing privilege at common law that protects communications between attorneys and clients. *See Wynn Resorts, Ltd. v. Eighth Jud. Dist. Ct.*, 399 P.3d 334, 341 (Nev. 2017) (*citing Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The purpose of the attorney-client privilege is to encourage clients to make full disclosures to their attorneys thereby promoting the broader public interests of recognizing the importance of fully informed advocacy in the administration of justice. *Id*.

In a diversity case, the Court must apply state law to determine the existence of any privilege. *See Copper Sands Homeowners Assn., Inc. v. Copper Sands Realty, LLC*, 210CV00510GMNNJK, 2014 WL 12782269, at *2 (D. Nev. June 20, 2014) (*citing* Fed. R. Evid. 501) ("Because the Court sits in diversity in this case, it turns to state law to determine the existence of any privilege."). "Where there is an absence of controlling Nevada law . . . the Court must use its best judgment in predicting how the Nevada Supreme Court would decide the substantive issues." *Capitol Indem. Corp. v. Wright*, 341 F. Supp. 2d 1152, 1157 (D. Nev. 2004) "In performing this function, the Court may be aided by reviewing well-reasoned decisions from other jurisdictions." *Id*.

Nevada has codified the attorney-client privilege, providing that "a client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications" relating to attorney representation. N.R.S. 49.095. Under Nevada law, the essential elements of the attorney-client privilege are as follows: (1) confidential communications, (2) between an attorney and client, (3) made for the purpose of facilitating the rendition of legal services. *See Lubritz v. AIG Claims, Inc.*, 217CV02310APGNJK, 2018 WL 10456239, at *3 (D. Nev. Apr. 18, 2018) (*citing*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Wynn Resorts, Ltd. v. Eighth Judicial Dist. Ct.*, 399 P.3d 334, 341 (Nev. 2017) (en banc). "A communication is 'confidential' if it is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." *Wynn Resorts, Ltd.*, 399 P.3d 334 at 341 (*citing* NRS 49.055). "Protected communications can be from a lawyer to a client or from a client to a lawyer." *Id. (citing Upjohn*, 449 U.S. at 390, 101 S.Ct. 677). "Mere facts are not privileged, but communications about facts in order to obtain legal advice are." *Id.* (*citing Upjohn*, 449 U.S. at 395–96, 101 S.Ct. 677 and *Wardleigh v. Second Judicial Dist. Ct.*, 111 Nev. 345, 352, 891 P.2d 1180, 1184 (1995).

The party asserting an exception to the privilege bears the burden of proving the elements of that exception. *See e.g. Garcia*, 2018 WL 6566563, at *5 ("The party seeking to pierce the attorney-client privilege bears the burden of establishing good cause for doing so . . ."). Here, Mr. Alvarado has asserted what is commonly referred to as the "at-issue" exception to the attorney-client privilege. Mr. Alvarado bears the burden of proving the elements of that exception.

**B. All of the Documents Mr. Alvarado Seeks to Compel Acuity to Produce are Privileged and Some Are Also Attorney Work Product.**

In its responses to Mr. Alvarado's first set of requests for production, Acuity asserted that the information withheld is protected by the attorney-client privilege and in some instances by the attorney work product doctrine. *See* ECF No. 23-6, Exhibit 6 to Plaintiff's Motion to Compel, Defendant's Responses Plaintiff's Request for Production of Documents, and ECF No. 23-7, Exhibit 7 to Plaintiff's Motion to Compel, privilege log produced by Acuity. Where it is alleged that withheld documents are not attorney work product or privileged, the party asserting the privilege bears the burden of establishing the elements of the attorney work product doctrine as well as the attorney-client privilege. *See Garcia, supra*. Here, however, Mr. Alvarado has not asserted that any of the essential elements of the attorney work product doctrine or attorney-client privilege are not met. *See* ECF No. 23. Rather Mr. Alvarado asserts that the protections of the attorney work product doctrine and attorney-client privilege have been waived pursuant to the "at-issue" exception to those protections. Thus, because the instant motion asserts that an exception to the asserted privilege applies, rather than that the withheld documents are not privileged to begin with, this Court's analysis must begin with a presumption that the withheld documents are protected from disclosure

11

unless Mr. Alvarado can meet his burden to prove the elements of the "at-issue" exception. *See Garcia, supra*.

**C.    Mr. Alvarado Has Failed to Provide the Information Necessary to Allow This Court to Analyze His Waiver Claim.**

Mr. Alvarado has failed to meet his burden in multiple regards. As a preliminary matter, by failing to identify with specificity those documents Mr. Alvarado claims to have been improperly withheld, Mr. Alvarado has failed to provide the information necessary for this Court to conduct the document-by-document analysis required to resolve the issues raised in his motion. *See Garcia*, 2018 WL 6566563, at *2 (holding that applicability of the attorney-client privilege must be made on a "document-by-document" basis and declining "to make an en masse ruling for 80 privilege designations"). As in *Garcia*, this Court should decline to make an en masse finding that the protections of the attorney work product doctrine and attorney-client privilege have been waived.

**D.    In Addition to Failing to Address in His Motion to Specific Documents Withheld by Acuity, Mr. Alvarado Has Failed to Establish the Essential Elements of the "At-issue" Waiver under Either the *Hearn* Test or the Anticipatory Waiver Theory**.

This Court has previously found that there is no controlling Nevada law on the scope of the "at-issue" waiver and has predicted that the Nevada Supreme Court would adopt the formulation of the implied "at-issue" wavier enunciated in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975). Specifically, in *Copper Sands Homeowners Assn., Inc. v. Copper Sands Realty, LLC*, this Court found that the Nevada Supreme Court's analysis in *Wardleigh* left some ambiguity with regard to which test for the scope of the "at-issue" waiver doctrine the Nevada Supreme Court would adopt. *See* 210CV00510GMNNJK, 2014 WL 12782269, at *6–9 (D. Nev. June 20, 2014) ("The Nevada Supreme Court's views on *Hearn* as enunciated in *Wardleigh* are unclear."); *see also Spargo*, 216CV03036APGGWF, 2017 WL 2695292, at *7 (predicting that Nevada will adopt *Hearn*).

Under the *Hearn* test, implied "at-issue" waiver occurs "when (1) the assertion of the privilege was the result of some affirmative act, such as filing suit; (2) through this affirmative act, the asserting party puts the privileged information at issue; and (3) allowing the privilege would deny the opposing party access to information vital to its defense." *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975). The *Hearn* test further requires that the party seeking to pierce the privilege must make "a substantial showing of merit." *Id*. at 582.

It is Acuity's position, however, that the Nevada Supreme Court has already rejected *Hearn* in favor of the better reasoned rule adopted by the Third Circuit in *Rhone-Poulenc Rorer, Inc. v. Home Indemnity Co.*, 32 F.3d 851, 863 (3d Cir. 1994). *See Wardleigh v. Second Jud. Dist. Ct.*, 891 P.2d 1180, 1187 (Nev. 1995) ("For reasons discussed above, **we elect not to embrace the doctrine espoused in *Hearn***. We do, however, adopt the anticipatory waiver theory because it reinforces the purpose of the privilege and ensures fairness in litigation.") (emphasis added).

Under the more narrow anticipatory waiver theory espoused in *Rhone-Poulenc*, implied "at-issue" waiver occurs <u>only</u> when (1) the privilege holder interjects the advice of counsel as an essential element of a claim or defense in the case and (2) the privilege holder will eventually be forced to draw upon the privileged communication at trial to prevail. *See Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994) ("As Rhone-Poulenc and Armour have not interjected the advice of counsel as an essential element of a claim in this case, the district court erred in affirming the magistrate judge's decision and in finding they must disclose documents . . . that would otherwise be protected from disclosure by the attorney client privilege."); *see also Molina v. State*, 87 P.3d 533, 539 n.26 (Nev. 2004) (restating the holding in *Wardleigh* as follows: "in civil cases [] implied waiver of privilege occurs when substance of communications is put at issue by a claim or defense and eventually claimant will be forced to draw upon the privileged communication at trial in order to prevail").

The *Rhone-Poulenc* test is the better reasoned approach because, as the Third Circuit noted, the *Hearn* test runs contrary to the fundamental basis of the privilege:

> Some decisions have extended the finding of a waiver of the privilege to cases in which the client's state of mind may be in issue in the litigation. These courts have allowed the opposing party discovery of confidential attorney client communications in order to test the client's contentions. *See, e.g., Byers v. Burleson*, 100 F.R.D. 436 (D.D.C.1983); *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975). These decisions are of dubious validity. While the opinions dress up their analysis with a checklist of factors, they appear to rest on a conclusion that the information sought is relevant and should in fairness be disclosed. Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue.

> As the attorney client privilege is intended to assure a client that he or she can consult with counsel in confidence, finding that confidentiality may be waived depending on the relevance of the communication completely undermines the interest to be served. Clients will face the greatest risk of disclosure for what may be the most important matters. Furthermore, because the definition of what may be relevant and discoverable from those consultations may depend on the facts and circumstances of as yet unfiled litigation, the client will have no sense of whether the communication may be relevant to some future issue, and will have no sense of certainty or assurance that the communication will remain confidential.

*Rhone-Poulenc*, 32 F.3d 851 at 864.

A Harvard Law Review article cited by the Nevada Supreme Court with approval in *Wardleigh* (*see* 111 Nev. 345 at 355-56) echoes this criticism of the *Hearn* approach and provides a cogent analysis of the ways in which the *Rhone-Poulenc* test meets the policies underlying the privilege, where the *Hearn* test fails to do so:

> These privileges have been instituted on the basis of a system-wide balancing of costs and benefits. Once all the technical requirements of a privilege have been met, courts should not impose their own sense of the equities, because trial judges may tend to give decisive weight to the needs of the parties before them, without adequately considering the full, system-wide benefits of a privilege. A case-by-case balancing test should be considered particularly inappropriate with respect to the attorney-client privilege, in light of the Supreme Court's emphasis on the role of certainty in 'encouraging full and frank communication between attorneys and their clients.' **A rule of waiver that turns on the opponent's need for information would subject the privilege to the hazards of fortune: the continued existence of one's privilege would depend not on how one has used or abused the privilege, but rather on who one's adversary happens to be**. One adversary might have ample access to information while another would not.
>
> . . .
>
> A theory of placing-at-issue based on the notion of anticipatory waiver, would not derive a waiver from the pleading of a good-faith defense. Because officials can carry the burden of proving good faith on the basis of their own testimony, defendants who plead good faith will not necessarily have to disclose the substance of their attorney-client communications at trial. Hence, under this view, **the faults in the *Hearn* approach are (1) that it does not succeed in targeting a type of unfairness that is distinguishable from the unavoidable**

14

unfairness generated by every assertion of privilege and (2) that its application cannot be limited.

First, even though evidence of an attorney's advice might be dispositive of a good-faith defense, permitting the privilege to shield such evidence would create unfairness that is traceable merely to 'incompleteness': the court would have to decide the question of good faith in the absence of some probative evidence. This type of incompleteness is the same as that caused whenever a party raises a privilege and forces a court to decide a factual question without examining all of the relevant evidence. This unfairness is distinguishable from that caused by a pre-trial or partial disclosure. So long as an official pleading a good-faith defense does not intend to introduce at trial any evidence bearing on his attorney's advice, neither the plaintiff's settlement valuation nor his ability to prepare for trial is impaired.

Second, the logic of the *Hearn* approach cannot be contained. Some examples from recent case law should illustrate how easily the logic of *Hearn* can be expanded. In *United States v. Exxon Corp.*, Exxon's motion to dismiss the government's action for failure to join indispensable parties was deemed a waiver of its attorney-client privilege with respect to the question of whether Exxon caused unlawful overcharges on the sale of oil by other co-owners of an oilfield. The court's logic came straight from *Hearn*: Exxon's motion asserted that Exxon was not responsible for the overcharges and thereby affirmatively placed the question of causation at issue; the only way for the government to prove such causation was by examining attorney-client 'discussions wherein such a scheme may have been concocted.' The result, however, was outrageous. No matter what Exxon might have pleaded, so long as attorney-client communications were the easiest way for the government to attack Exxon's position, the privilege would be waived.

Even the affirmative act requirement of the *Hearn* test bears little, if any, relation to the fairness concerns *Hearn* was attempting to address. In *Pitney-Bowes, Inc. v. Mestre*, Pitney-Bowes decided to bring a declaratory action to repudiate a contract instead of simply refusing to make further payments under it. Refusing further payments would have forced the defendant, Mestre, to sue Pitney-Bowes, instead of vice-versa. With Mestre as the plaintiff and Pitney-Bowes as the defendant, Mestre would have been the party affirmatively interjecting the 'intent of the parties' into the action. Mestre would have been the one to lose its attorney-client privilege, not, as it turned out, Pitney-Bowes. This example illustrates how poorly the *Hearn* affirmative act requirement addresses the problem of manipulation of a privilege.

Under the anticipatory waiver theory, waiver would not depend on a party bringing suit rather than permitting suit to be brought against it.

The anticipatory waiver theory concerns itself solely with the decision, whether by plaintiff or defendant, to commit to a course of action that would require the disclosure of privileged material. **A defendant who answers a complaint with a general denial has not committed himself to such a course, because he bears no initial burden of going forward with evidence. Pleading an affirmative defense, however, if the defense can be established only with privileged evidence, will waive the defendant's privilege. The critical choice being exercised by the pleader is not whether to sue or defend, but whether to do so with privileged evidence.** The decision to use privileged evidence should create a waiver of the evidence so disclosed and of any other evidence with regard to the same subject matter.

Developments in the Law-Privileged Communications, 98 Harv. L. Rev. 1629, 1640–43 (1985) (emphasis added) (*discussing United States v. Exxon Corp.*, 94 F.R.D. 246 (D.D.C. 1981) and *Pitney-Bowes , Inc. v. Mestre*, 86 F.R.D. 444 (S.D. Fla. 1980)).

Similarly, in *Bertelsen v. Allstate Insurance Co.* the South Dakota Supreme Court criticized and rejected *Hearn* finding it to be unpredictable, unjust, and unworkable:

Any standard for determining whether a client has impliedly waived the attorney-client privilege must produce predictable results. After all, the privilege serves the interests of justice by encouraging full and frank communication between an attorney and his client. *Upjohn v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). To achieve that end, the privilege must be predictable. *Rhone–Poulenc Rorer*, 32 F.3d at 863. A privilege that depends on widely varying applications by courts is not predictable and thus little better than no privilege at all. *Id*. (*quoting In re von Bulow*, 828 F.2d 94, 100 (2d Cir.1987)).

Application of the *Hearn* test alone provides insufficient guidance to be just and workable. In *Lee*, for example, an insurer argued that it acted in subjective good faith based on its evaluation of state law. While the insurer did not expressly raise an advice-of-counsel defense, the claims adjusters' knowledge of the law consisted entirely of the advice of counsel. Because the insurer's evaluation of state law necessarily included the advice of counsel, the Arizona Supreme Court applied the *Hearn* test and held that the insurer affirmatively injected the advice of its counsel into the case. *Id*. at 62, 13 P.3d at 1179. The court thus ordered the disclosure of communications between the insurer and its counsel. We believe that *Lee* goes too far, demonstrating that the *Hearn* test does not strike an appropriate balance of the need for discovery with the importance of maintaining the privilege.

796 N.W.2d 685, 702–03 (S.D. 2011).

Although this Court previously found that the Nevada Supreme Court's views on *Hearn* as enunciated in *Wardleigh* were unclear, (*see Copper Sands Homeowners Assn., Inc. v. Copper Sands Realty, LLC*, 210CV00510GMNNJK, 2014 WL 12782269, at *6–9 (D. Nev. June 20, 2014)), this Court also acknowledged that the Nevada Supreme Court discussed criticism of the *Hearn* test, and expressly "elect[ed] not to embrace the doctrine espoused by *Hearn*." *Id*. (*citing Wardleigh*, 891 P.2d at 1187). This Court, however, ultimately based its decision that the Nevada Supreme Court would adopt *Hearn* on the finding that in *Wardleigh* the Nevada Supreme Court "analyzed the issue before it by relying entirely on *Byers*, quoting it approvingly for the proposition that **a plaintiff should not be able to withhold privileged information that the defendant needs to respond to the plaintiff's contentions**." *Id*. (emphasis added). Thus, while the Nevada Supreme Court's decision in *Wardleigh* may have cited *Byers v. Burleson*, the actual holding in *Wardleigh* was limited (like the rule enunciated in *Rhone-Poulenc*) insofar as it found at-issue waiver because **the privilege holder – not his opponent – had interjected privileged matters into the case**. Thus, even if the Nevada Supreme Court implicitly adopted in part the rule enunciated in *Hearn* it is clear that under Nevada law the privilege holder must interject privileged matters into the case. It is not enough that the party seeking to pierce the privilege has asserted a claim that may be proven by access to privileged materials, nor does at issue waiver apply under Nevada law merely because a privilege holder has answered a complaint containing such a claim. *See Wardleigh, supra*.

This Court has similarly applied *Hearn* with a limiting interpretation that viewed at-issue waiver under *Hearn* as much narrower than the expansive interpretation given *Hearn* by some courts. As this Court explained in *Garcia v. Serv. Employees Intl. Union*,

> "Attorney-client communications do not become discoverable simply because they are related to issues in the litigation." *United States v. W.R. Grace*, 455 F. Supp. 2d 1140, 1146 (D. Mont. 2006) (internal quotations omitted). Waiver occurs when the privilege holder puts its own lawyer's performance at issue through its own affirmative conduct. *See Hearn*, 68 F.R.D. at 581.
>
> **A defendant privilege-holder has not waived privilege through its adversary's affirmative conduct in initiating litigation that questions the good faith of the defendant**. *Gardner v. Major Auto. Cos., Inc.*, 2014 WL 1330961, at *7 (E.D.N.Y. Mar. 31, 2014) ("a party cannot effectively force its adversary to waive its privilege implicitly

17

with a pleading that brought the adversary's knowledge and good faith into issue"); *see also Jones v. Life Ins. Co. of N. Am.*, 2014 WL 8753996, at *4 (N.D. Cal. Dec. 15, 2015)2014 WL 8753996, at *4 (N.D. Cal. Dec. 15, 2015). "**It cannot be possible for [a litigant] to justify breaching [the opposing party's] privilege by reason of its own pleading ... That would give an adversary who is a skillful pleader the ability to render the privilege a nullity.**" *Chase Manhattan Bank, N.A. v. Drysdale Securities Corp.*, 587 F. Supp. 57, 59 (S.D.N.Y. 1984) (emphasis in original).

Because the privilege holder must put its communications at issue by some affirmative act, the mere denial of intent is insufficient to waive privilege. *See, e.g., Laser Indus., Ltd. v. Reliant Techs., Inc.*, 167 F.R.D. 417, 446 (N.D. Cal. 1996). Similarly here, the Court rejects the argument that Plaintiffs' own pleading of bad faith acts as a waiver of Defendants' privilege

217CV01340APGNJK, 2018 WL 6566563, at *4 (D. Nev. Sept. 6, 2018) (emphasis added). Thus, even under the formulation of *Hearn* approved of by this Court, waiver does not occur simply because the privilege holder has denied the allegations contained in his adversary's pleadings.

1. **Mr. Alvarado has failed to establish the essential elements of the "at-issue" waiver under *Hearn* because he has not and cannot show that Acuity engaged in any affirmative act that put privileged information at issue.**

Here, Mr. Alvarado asserts that Acuity waived the attorney-client privilege "by forcing Plaintiff to file this lawsuit and using Ms. Temple as a 'super adjuster' rather than a normal attorney." ECF No. 23, p.8:2-3. More specifically, Mr. Alvarado asserts that Acuity "forced" him to file the instant lawsuit by moving to withdraw from the underlying personal injury action thereby thwarting "Plaintiff's efforts to save time and money by finishing that case with the discovery that had been completed." *Id*. at p.9:16-17.

Mr. Alvarado's assertion is fatally flawed for many reasons, perhaps most obviously insofar as the underlying personal injury case could not have been maintained even in the absence of a motion to withdraw by Acuity. At the time of Acuity's withdrawal from the underlying personal injury action there were no causes of action that remained pending in that case. *See* ECF No. 23-1, Exhibit 1 to Plaintiff's Motion to Compel, Acuity's Motion to Withdraw at p.2:21-22. The deadline for Mr. Alvarado to seek leave to amend his Complaint had passed without Mr. Alvarado seeking leave to assert any claims against Acuity. *Id*. at p.2:24-26. Even after Acuity filed its motion to

withdraw Mr. Alvarado did not seek leave to extend the deadline to amend his Complaint to assert claims against Acuity or any other party, but instead pointed to some vaguely described "coverage" issues outside the context of any asserted cause of action as a basis to continue the underlying personal injury case. *See* ECF NO. 23-3, Exhibit 3 to Plaintiff's Motion to Compel, Transcript, at p.11-14. With all asserted causes of action having been resolved via settlement, there remained no triable issue in the underlying personal injury case, such that even if Acuity had not moved to withdraw that case would ultimately have been dismissed anyway as there was no remaining party in that case against whom Mr. Alvarado sought any redress. *See e.g. Diamond v. Charles*, 106 S. Ct. 1697, 1706-07 (1986) ("Diamond's status and an intervenor below, whether permissive or as of right, does not confer standing sufficient to keep the case alive in the absence of the State on this appeal . . . an intervenor's right to continue suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III."); and *Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1330 (11th Cir. 2007) ("Intervenors must show independent standing to continue a suit if the original parties on whose behalf intervention was sought settle or otherwise do not remain adverse parties in the litigation. Similarly, "piggyback" standing requires the existence of a justiciable case or controversy at the point at which intervention is sought"). As there remained no justiciable case or controversy pending in the underlying personal injury case, Acuity had no standing to remain in the case and the court would ultimately have been required to dismiss it even if no motion to withdraw had ever been filed. Thus, it was not Acuity but the standing requirement of Article III that forced Mr. Alvarado to file this suit asserting a justiciable case or controversy against Acuity.

Mr. Alvarado's position is further flawed because he cannot provide factual support for his assertion that Attorney Temple acted as a "super adjuster." As outlined above, from the time the UIM claim was first reported to Acuity, Mr. Kides acted as the adjuster on the claim and this did not change when Attorney Temple was retained to defend the interests of Acuity by intervening in and monitoring the underlying personal injury claim. *See* Section II.A., *supra*. The fact that Mr. Kides communicated with Attorney Temple during the underlying personal injury claim does nothing to undermine Mr. Kides independent review of the accident report, medical records and bills, or his interview and assessment of witnesses both informally and by attending depositions taken in the underlying personal injury case.

The rule proposed by Mr. Alvarado seriously compromises the right of insurance companies to defend themselves in court. On the one hand, Nevada law requires that UIM carriers intervene in underlying personal injury actions or risk being bound by any potential default judgment entered in such a case. *See Est. of Lomastro v. Am. Fam. Ins. Grp.*, 124 Nev. 1060, 1067, 195 P.3d 339, 344 (2008) (holding that an insurance company that has issued a UIM policy "is bound by the result of an action between its insured and an uninsured motorist when the carrier has notice of the action but elects not to intervene."). On the other hand, Mr. Alvarado argues that merely by retaining counsel to intervene in such an action the UIM carrier causes that attorney to become a "super adjuster" with whom communication are not entitled to the protection of the attorney-client privilege or work product doctrine. Such a harsh rule would require insurance companies to dance on the edge of a knife while doing nothing to further the interests of justice.

**2.   Mr. Alvarado has failed to establish the essential elements of the "at-issue" waiver under *Hearn* because he has not and cannot show that allowing the privilege would deny him access to information vital to his claims or Acuity's defenses.**

Mr. Alvarado further fails to satisfy Hearn insofar as he has made no showing that the mental impressions, opinions, or advice of Attorney Temple is vital to his claims or Acuity's defenses. First and foremost, Acuity has not asserted that it relied on the advice of Attorney Temple in investigating or evaluating Mr. Alvarado's claim. To the contrary, Acuity has produced the non-privileged portions of its claim file, and that claim file shows that all decisions regarding the evaluation of his UIM claim were based upon the independent investigation and evaluation of Mr. Kides working together with Ms. Grandon and Mr. Behrend. *See* ECF No. 23-4, Exhibit 4 to Plaintiff's Motion to Compel, portion of Acuity's Claim file; *see also* Section II.B., *supra*. Even the portion of the claims file quoted by Mr. Alvarado in the instant motion demonstrates that, at most, the impressions, opinions, and advice of Attorney Temple only bolstered Mr. Kides own opinion that there was no UIM exposure. *See* ECF No. 23, Plaintiff's Motion to Compel at p.7:4-14 (referencing a claims file note entered by Mr. Kides stating that Attorney Temple "agrees still do not see exposure to our UIM with what appears to be $2 mil in underlying"). While Attorney Temple may have expressed her agreement with Mr. Kides evaluation of the lack of UIM exposure, evidence of such agreement does nothing to aid Mr. Alvarado in proving his claims of breach of contract or bad faith, and while it may bolster Acuity's general denial of the allegations made by Mr. Alvarado it is certainly not vital

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to Acuity's defense. To the contrary, Acuity is quite comfortable proceeding to trial in reliance upon the thorough, competent, and good faith investigation and evaluation of the claim performed by Mr. Kides in conjunction with Ms. Grandon and Mr. Behrend.

**3.  Mr. Alvarado has failed to establish the essential elements of the "at-issue" waiver under *Hearn* because he has not and cannot make the required substantial showing of merit.**

Although Mr. Alvarado's motion thoroughly details the demands he made and the medical records and bills he submitted in support thereof, it utterly fails to analyze or even acknowledge the substantial evidence showing those demands, medical records, and bills were grossly overstated. As outlined above, two medical experts provided opinions that Mr. Alvarado's claimed injuries and resultant medical treatment and expenses were not causally connected to the January 30, 2017 accident. *See* **Exhibits 1 and 2**; *see also* Section II.A., *supra*. The medical expert reports omitted from Mr. Alvarado's motion demonstrate that Acuity has substantial support for its defense that no breach of contract nor bad faith has occurred, and that therefore the causes of action asserted by Mr. Alvarado in this case are not meritorious. Moreover, these medical expert reports demonstrate that Mr. Alvarado cannot even make a substantial showing that his claim for UIM coverage is substantially meritorious.

**4.  Mr. Alvarado has failed to establish the essential elements of the "at-issue" waiver under *Rhone-Poulenc* because he has not and cannot show that Acuity interjected the advice of counsel as an essential element of any of affirmative defense asserted in this case nor that Acuity will be required to draw upon privileged information to prevail at trial.**

The well reasoned rule enunciated in *Rhone-Poulenc* holds that "at issue" waiver cannot occur as a result of the assertion of issues by the privilege holder's opponent, but instead may only occur when the privilege holder takes some affirmative action to interject privileged matters into the case thereby placing privileged communications "at issue," such as when the privilege holder relies on the defense of acting in accordance with advice of counsel. *See e.g. Rhone-Poulenc, supra.; see also Hikita v. Nichiro Gvogyo Kaisha, Ltd.*, 713 P.2d 1197, 1207 (Alaska 1986) (client's offer of attorney's testimony as to client's state of mind waives privilege); *Beckette v. State*, 31 Md. App. 85, 94 (1976) (calling attorney as character witness to client's truthfulness waives privilege).

Under the anticipatory waiver theory espoused in *Rhone-Poulenc* no waiver has occurred here because Acuity has done nothing more than answer Mr. Alvarado's complaint. Acuity has not asserted any affirmative defense that will require it to draw upon privileged information at trial. Acuity has not offered Attorney Temple as a witness. And Acuity has not asserted an advice of counsel defense. Indeed, Acuity does not intend to do so. As previously stated, Acuity is quite comfortable with the investigation and evaluation performed by Mr. Kides, and the supervision of that investigation and evaluation performed by Ms. Grandon and Mr. Behrend. Although Mr. Kides communicated with Attorney Temple throughout the duration of her retention, the handling of the UIM claim by Mr. Kides, Ms. Grandon, and Mr. Behrend and all decisions regarding that claim were independent of any mental impressions, opinions, advice, or other communications from Attorney Temple.

**E.     Even If the Court Determines the Attorney-Client Privilege May Have Been Waived, Production of the Withheld Documents is Only Appropriate If After an In Camera Review the Court Determines That the Withheld Documents are Vital to Mr. Alvarado's Ability to Prove His Claims, However, Even In Camera Review of Privileged Documents is Disfavored.**

If the Court finds there is a sufficient evidentiary basis to support a reasonable belief that the withheld documents are not privileged, the appropriate remedy would be to review those documents in camera, but even in camera review is disfavored. *See Garcia*, 2018 WL 6566563, at *5 ("In camera review of documents is disfavored and does not replace the standard adversarial process.") (*citing Diamond State Ins. Co. v. Rebel Oil Co.*, 157 F.R.D. 691, 700 (D. Nev. 1994); *see also Nikita, Ltd. v. Fuji Photo Film Co.*, 181 F.R.D. 465, 467 (D. Nev. 1998)). "An in camera review requires the presentation of a sufficient evidentiary basis to support a reasonable belief that the documents are not privileged." *Id.* (*citing United States v. Zolin*, 491 U.S. 554, 572 (1989))."

If the Court determines that an in camera review of the withheld documents is appropriate, however, it is difficult to imagine a scenario where the withheld documents could prove vital to Mr. Alvarado's claims. Specifically, the non-privileged portions of the claim file that have been produced, together with the expert medical reports of Dr. Wang and Dr. Poindexter provide ample support for Mr. Kides determination that there was no UIM exposure. Mr. Alvarado contends that the attorney-client privilege is waived because Attorney Temple acted as a "super adjuster" thereby

usurping the role of Mr. Kides. But in order for the opinions and advice of Attorney Temple to support Mr. Alvarado's breach of contract, unfair insurance practices, or bad faith claims, the withheld documents would need to show that Attorney Temple recommended that Acuity pay out UIM benefits. If the withheld documents show that Attorney Temple at all times agreed with Mr. Kides that there was no UIM exposure, then the withheld documents would not support a finding in Mr. Alvarado's favor on any of the claims he has asserted. Conversely, if the withheld documents show that Attorney Temple disagreed with Mr. Kides and recommended that Acuity pay out UIM benefits, then Mr. Alvarado's theory that the attorney-client privilege was waived due to Attorney Temple taking on the role of "super adjuster" fails. Thus, it is Acuity's position that no waiver has occurred and no disclosure of the withheld documents ought to be ordered, but if the Court disagrees Acuity respectfully requests that said documents be reviewed in camera before the Court makes any ruling on the issue of their disclosure to Mr. Alvarado.

**F.    Judicial Estoppel is Wholly Inapplicable Here.**

Mr. Alvarado claims that Acuity should be judicially estopped from asserting that Attorney Temple acted as its defense counsel in the underlying case because Attorney Temple previously represented that Acuity intervened in the underlying case for the purpose of monitoring that proceeding. *See* ECF No. 23, p.12:12-14:6. As argued by Mr. Alvarado, application of the doctrine of judicial estoppel "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." ECF No. 23, p.12:14-17 (*citing Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600(9th Cir. 1996). This argument fails for two reasons: First, Acuity gained no advantage by asserting that it intervened in the underlying case to monitor that proceeding. Second, the positions asserted by Acuity in the two proceedings are not inconsistent.

Mr. Alvarado's assertion that Acuity obtained the advantage of being allowed to withdraw from the underlying action by asserting that it had intervened only to monitor those proceedings has no merit. As outlined above, however, there were no causes of action that remained pending at the time Acuity moved for withdrawal and even if Acuity had wanted to continue in the prior underlying action it lost standing to do so when Mr. Alvarado voluntarily settled with the tortfeasors thereby resolving all causes of action asserted by him in the underlying action. *See* Section III.D.1., *supra*. Thus, any representation made by Attorney Temple at the hearing of Acuity's motion to withdraw

did not result in any advantage to Acuity, because regardless of whether Acuity moved for withdrawal, when Mr. Alvarado settled all of the causes of action asserted therein dismissal became inevitable.

Similarly, Mr. Alvarado's assertion that Acuity seeks to assert incompatible positions has no merit. Under Nevada law, an insurance company "is bound by the result of an action between its insured and an uninsured motorist when the carrier has notice of the action but elects not to intervene." *See Est. of Lomastro ex rel. Lomastro v. Am. Fam. Ins. Grp.*, 124 Nev. 1060, 1067, 195 P.3d 339, 344 (2008) (*quoting State Farm Mut. Auto. Ins. v. Wharton*, 88 Nev. 183, 187 n. 7, 495 P.2d 359, 362 n. 7 (1972)). Thus, when Acuity intervened in the underlying personal injury case it did so to defend its interests by monitoring that case to ensure that no default judgment was entered that would be binding upon Acuity. No causes of action were directly asserted against Acuity and the tortfeasors appeared in the action and defended themselves until ultimately a settlement was reached. Accordingly, monitoring was all that was required to defend the interests of Acuity in the underlying proceeding. Mr. Alvarado has cited no authority supporting the proposition that the attorney-client privilege does not attach under these circumstances. Thus, there is no inconsistency between the position asserted by Acuity through its counsel in the underlying case and the position asserted by Acuity here.

## IV. CONCLUSION

For the foregoing reasons Acuity respectfully requests that this Court apply the narrower rule of anticipatory waiver enunciated in *Rhone-Poulenc* and under that rule finds that no waiver of the attorney-client privilege or work product doctrine has occurred. Even if the Court applies the more expansive *Hearn* test, Acuity respectfully requests that the Court find that no waiver has occurred. If the Court does, however, determine that waiver has occurred, Acuity respectfully requests that the Court review the withheld documents in camera before issuing any ruling regarding disclosure

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

24

to Mr. Alvarado. Finally, Acuity respectfully requests that the Court find that judicial estoppel is not applicable.

DATED this 2nd day of August, 2022.

THE FELDMAN FIRM


By ___*/s/ David Feldman*___
      David J. Feldman, Esq.
      Nevada Bar No. 5947
      Rachel J. Holzer, Esq.
      Nevada Bar No. 11604
      8831 West Sahara Avenue
      Las Vegas, Nevada 89117
      Telephone:  (702) 949-5096
      Facsimile:  (702) 949-5097
      dfeldman@feldmanattorneys.com
      rholzer@feldmanattorneys.com
      *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I am employee of The Feldman Firm, and that on the 2nd day of August, 2022, I served the above and foregoing **OPPOSITION TO MOTION FOR ORDER COMPELLING PRODUCTION OF CRITICAL CLAIM EVALUTION DOCUMENTS WITHHELD BY ACUITY** on the following parties in compliance with the Nevada Electronic Filing and Conversion Rules:

Steven T. Jaffe, Esq.
Taylor R. Anderson, Esq.
**HALL JAFFE & CLAYTON, LLP**
7425 Peak Drive
Las Vegas, Nevada 89128
Telephone: (702) 316-4111
Facsimile:  (702) 316-4114
Email:  sjaffe@lawhjc.com; tanderson@lawhjc.com

and

John P. Shannon, Esq.
Jason S. Cook, Esq.
**LAW OFFICE OF WILLIAM H. JACKSON, LLC**
3320 N. Buffalo Dr., Suite 202
Las Vegas, Nevada 89129
Telephone: (702) 489-3030
Facsimile:  (702) 489-3033
Email: john@williamjacksonlaw.com; jason@williamjacksonlaw.com
*Attorneys for Plaintiff*

*/s/Heather Miller*
An Employee of THE FELDMAN FIRM